DECISION
This matter is before the Court following the filing by the plaintiffs (hereinafter referred to as the Coventry School Committee or the School Committee) on November 2, 1995 of a complaint against the members of the Coventry Town Council in their official capacity and against the Finance Director of the Town of Coventry. The defendants (hereinafter referred to as the Town or the Town Council) filed an answer and subsequently filed an amended answer and a third party complaint against the Commissioner of the Rhode Island Department of Elementary and Secondary Education (hereinafter the Commissioner). Under the provisions of title 16, chapter 2, section 21.4 of the Rhode Island General Laws, a newly enacted statute generally referred to as the Caruolo Bill, matters of this nature are entitled to expedited treatment in the Superior Court. Accordingly, an order was entered providing for expedited discovery. Trial of this matter occurred on four trial days in December of 1995. The legislation referred to above essentially provides for judicial determination in the event that after following prescribed procedures the School Committee is dissatisfied with the funding for school purposes provided by the local appropriating authority and believes that the level of funding provided precludes it from adequately running the schools for the current school year with a balanced budget as mandated by state law.
BACKGROUND
Prior to the enactment of the Caruolo Bill budget disputes between municipal governments and school committees were treated as administrative appeals to the Commissioner of Education. Appeals from the Commissioner ran to the Board of Regents and thereafter were subject to review by the Supreme Court pursuant to the provisions of § 16-39-4 by petition for common law certiorari (West Warwick School Committee v. Souliere,626 A.2d 1280 (1993)). As stated by our Supreme Court in Beil v. CharihoSchool Committee, Memorandum and Order 95-502, November 16, 1995:
 "The new legislation changes elements of prior law regarding the reconciliation and adjustment of local school budgets in instances where the school committee determines that its annual appropriated budget is not sufficient to meet state imposed educational mandates while satisfying the School Committee's statutory obligation to maintain a "balanced" budget. The effect of the new law is that the ultimate decision-making power with respect to school budget disputes will be vested in the Superior Court, which may enter an order after conducting an evidentiary hearing requiring local appropriating authority to increase the funds appropriated for the support of the local school system."
The new legislation referred to by our Supreme Court is §16-2-21.4, which creates a four-step process for the reconciliation of school funding disputes.
First, the school committee must bring its spending in line with the amount appropriated. Second, the school committee is required to petition the Commissioner of Education in writing to seek alternatives for the district to comply with state regulation and/or provide waivers with respect to certain regulatory requirements concerning the extent or quality of educational programs. Third, if the alternatives or waivers are denied the school committee can request the appropriating authority to reconsider its appropriation decision. Fourth, the school committee may seek additional appropriations following its compliance with the foregoing by filing an action in the Superior Court for Providence County. In such court proceeding the school committee is required to demonstrate that it lacks the ability to adequately run the schools for that school year with a balanced budget within the previously authorized appropriation.
This Court is satisfied, predicated upon the evidence before it, that the School Committee procedurally has complied with the provisions of § 16-2-21.4 of our General Laws. The evidence, primarily in the form of testimony and documentary evidence, which came in through the testimony of Superintendent Spear discloses and the Court finds that the process of arriving at the current school year budget began in late 1994. At that time and over a period of months the Superintendent collected budget planning materials from various administrators within the school department. The Superintendent, pursuant to his statutory responsibility as set forth in § 16-2-11 (10), prepared a draft school budget which was presented to the School Committee on February 23, 1995. The proposed budget was accompanied by a "1995-1996 school year budget statement," which included observations to the effect that Coventry is the 7th largest school district in the State, operates under the 7th largest budget, employs the 7th largest professional staff, and ranks 29th out of 36 districts in regard to money spent per pupil. This draft budget was in the total amount of $36,697,933, an increase of $2,975,583 over the previous year's total expenditures.
After receipt of the Superintendent's proposed budget, the School Committee held a series of budget review sessions to review, discuss, and finalize the 1995-1996 school budget. A public hearing was held on March 14, 1995 following which the School Committee forwarded the 1995-1996 school year budget to the Town Manager on March 17, 1995 following certain modifications to the budget suggested by the Superintendent. At that time the School Committee's budget called for $36,658,153 in total expenditures. Following various discussions the School Committee and the Town Council met in a work session on May 8, 1995 in an attempt to reach accord with regard to the budget figures. On May 22 the Town Council voted to approve and send to the voters a 1995-1996 school year budget in the amount of $34,918,662, a reduction of approximately $1.7 million from the amount requested by the School Committee. Pursuant to the provisions of the Town Charter a Financial Town Meeting was held on June 13, 1995 and the $34,918,662 amount approved by the Town Council was appropriated by the Financial Town Meeting. Thereafter, on June 27, 1995, a Referendum Vote concerning the amount of funds to be allocated to the school department took place in the Town of Coventry. As a result of that vote, the amount finally allocated to the school department was decreased to $34,287,572, a difference as compared to the budget proposed by the School Committee of $2,370,581 plus.
Acting in accordance with the provisions of § 16-2-21 of the Rhode Island General Laws the School Committee, on July 6, 1995, voted to reduce its anticipated expenditures by $2.37 million dollars.
At this juncture, being advised of the provisions of the Caruolo Bill, the Superintendent and the School Committee were able internally to cut $809,750 from the proposed budget; leaving a shortfall of approximately $1.5 million dollars. At that time the School Committee forwarded to the Commissioner a request for waivers in order to allow it to operate on a reduced budget. The Court notes that the request for waivers was replete with observations by the School Committee to the effect that the requested waivers were, in the opinion of the School Committee, not in keeping with the best interests of the students of the Coventry school system or were violative of pertinent statutes or regulations. Particularly, in light of the tenor of those observations it is not surprising that the Commissioner either denied each and every waiver request based on the likelihood of an adverse impact on the Basic Education Program (BEP) or federally mandated programs and standards or left to the School Committee's determination the ultimate resolution and determination of whether the waiver was appropriate. In view of the Commissioner's action the School Committee voted to add back to its heretofore reduced budget $1.5 million dollars cut at the June 6 meeting and to seek a special referendum in order to ask the voters to restore the funds to the school budget. The Town Council denied the petition for a second referendum, essentially indicating that the voters had conclusively voiced their opinions on the subject. Following that action by the Town Council the Superintendent was able to obtain certain relief from the Coventry Teachers' Alliance (the union representing most of the employees of the (School Committee), allowing an additional $500,000 to be trimmed from the budget. Further negotiations ensued between the School Committee and the Town. At this point the 1995-1996 school year was underway and the School Committee was operating on what it deemed to be its minimum budget which, after the last $500,000 reduction referred to was at a level of $1 million dollars more than the amount appropriated by the voters. On November 15, 1995, a second voter referendum was held in the Town of Coventry to seek voter approval to supplement by an additional $1 million dollars the 1995-1996 school budget. That referendum was defeated.
On November 16 the School Committee voted to bring the instant action pursuant to the provisions of § 16-2-21.4.
ROLE OF COURT
This Court, in undertaking its examination of this matter in the first instance, determined the role that has been assigned to it by the legislation known as the Caruolo Bill. The School Committee tells us in both its pretrial and post trial memoranda that the proper standard of review under § 16-2-21.4 is whether the local school committee has abused its discretion in interpreting the requirements imposed by law. It goes to great lengths in the memoranda to suggest to this Court that its role is essentially that of judicial review in which deference should be accorded to agency decision-making in the area of the agency's special knowledge and expertise. A fair reading of the school Committee's position would essentially limit the scope of review of this Court to that contemplated by the provisions of the Administrative Procedures Act. This Court, in interpreting the provisions of the Caruolo Bill, must disagree with the position espoused by the School Committee. This Court believes that the clear mandate of the Caruolo Bill requires a trial on the merits of the controversy between the School Committee and the Town with the School Committee (plaintiff) having the burden ". . . to demonstrate that (it) lacks the ability to adequately run the schools for that school year within a balanced budget. . . ." This Court further believes that that burden is carried as in other civil matters by a preponderance of the evidence and not by any other standard.
This Court notes that under Rule 52 of the Rules of Civil Procedure that ". . . . in all actions tried upon the facts without a jury . . . the court shall find the facts specially and state separately its conclusions of law thereon. . . ." Accordingly, based upon its review of the testimony and other evidence adduced herein the Court finds by a preponderance of the evidence the following facts:
 FINDINGS OF FACT
 1. Plaintiffs, Edward Madonna, William D. Potter, Jr., Joseph Butler, Sr., Lawrence Donahue, and James McArdle, are the duly elected members of the Coventry School Committee, a governmental body organized pursuant to R.I. General Laws § 16-2-9.
 2. Plaintiff, Raymond Spear, is the duly appointed Superintendent of the Coventry Public Schools.
 3. Defendants, Virginia Soucy, Francis J. Perry, Jr., Edward J. Carley, James J. Kiley, Sr., and James J. Spearman, are the duly elected members of the Town Council of the Town of Coventry, a municipality duly organized under the laws of the State of Rhode Island.
 4. Defendant, Barry Yeaw, is the duly appointed Town of Coventry Finance Director, who also serves in the capacity of Town Treasurer.
 5. Third party defendant, Peter McWalters, is the duly appointed Commissioner of Elementary and Secondary Education for the State of Rhode Island.
 6. School budgets are flexible documents based on projected expenditures and revenues. School committees have unfettered discretion to move funds from line item to line item once appropriations are made by appropriating authority. See Coventry School Committee v. Richtarik, 411 A.2d 912, 914 (R.I. 1980); "Under our law, once an appropriation is made for the use of the school committee, the expenditure of those funds is within the Committee's sole and exclusive jurisidiction." (cites omitted)).
 7. Superintendent Spear presented his proposed budget to the School Committee on February 23, 1995 in which he recommended a total budget of $36,697,933, a figure which represented an increase of $2,975,583 over the previous year's total expenditures. The additional funds requested were attributed to $1,885,954 in wage increases and new hires, a 25% increase in health care benefit costs, and additional expenditures for basic operating costs, transportation, Physical Plant, extra curricular, purchased services, staff training and technology. Not counting new hires, contracted-for raises in teacher salaries accounted for $1,241,000.00 of the increase of expenditures from the 1994-1995 to 1995-1996 budgets.
 8. The Coventry Public School properties consist of 11 buildings, totaling approximately 700,000 square feet, including six elementary schools, one middle school, one high school, one vocational school and two administration and physical plant buildings.
 9. Coventry currently serves approximately 5450 students and employs 395 teachers, 160 non-certified staff, and 24 management personnel, including central office and building administrators.
 10. According to figures contained in Rhode Island Public Schools 1994 District Profiles, as published by the Rhode Island Department of Education, (Joint Exhibit 9A), at the time of the preparation of the current school year budget Coventry was the 7th largest district in the State, operated under the 7th largest budget, employed the 7th largest professional staff, yet ranked 29th out of 36 districts in regard to money spent per pupil.
 11. Coventry ranks 32nd out of the 36 Rhode Island school districts in terms of percentage increase in per-pupil expenditures over the past 15 years. (School Committee Exhibit No. 13).
 12. Upon receipt of the Superintendent's proposed budget, the School Committee held a series of budget review sessions to review, discuss and finalize a 1995-1996 school budget. After a public hearing on March 14, 1995, the School Committee forwarded its 1995-1996 school year budget to the Town Manager on March 17, 1995; the amount requested was $36,658,153.00.
 13. The Town Council held a public hearing on April 27, 1995 to discuss the School District budget. The School Committee and the Town Council then met in a work session on May 8, 1995 in an attempt to reach a compromise in regard to the budget. The Coventry School Committee submitted a budget request for the 1995-1996 school year to the Coventry Financial Town Meeting in the amount of $36,658,153.00.
 14. On May 22, the Town Council voted to approve and send to the voters a 1995-1996 school year budget in the amount of $34,918,662, a reduction of approximately $1.7 million from the amount requested by the School Committee. The Superintendent immediately began work on possible cuts to be made in order to bring the school budget in line with the amount approved by the Town Council.
 15. The annual Financial Town Meeting was held on June 13, 1995, at which time the School Department was appropriated $34,918,662, the amount approved by the Town Council.
 16. On June 27, 1995, the Town of Coventry held a Referendum Vote concerning the amount of funds to be allocated to the School Department. As a result of that election, the amount allotted to the School Department dropped to $34,287,572. As compared to the budget proposed by the School Committee, the schools now faced a shortfall of $2,370,581.00.
 17. On July 6, 1995, in compliance with the dictates of R.I. General Laws § 16-2-21, the School Committee voted to reduce its anticipated expenditures by $2.37 million. The Coventry School Committee noted its opinion that their adjusted budget, although balanced on paper, failed to provide sufficient funds to meet all State and local requirements for the coming school year.
 18. In response to the anticipated budget shortfall of $2.37 million, school officials trimmed $809,750 from the School Committee's proposed 1995-1996, school year budget without (in their opinion) directly impacting the School Department's ability to meet its statutory and contractual obligations.
 19. On August 3, 1995, School Committee Chairman Edward Madonna, on behalf of the School Committee, forwarded to the Commissioner an extensive request for waivers of applicable educational requirements as contained in the Regulations of the Board of Regents for Elementary and Secondary Education, including the State Basic Education Program (BEP) in order to allow them to operate on a reduced budget. (School Committee Exhibits No. 2 and 3).
 20. On August 21, 1995 the Commissioner responded to the School Committee's waiver request and, essentially relying on the School Committee's feelings therein expressed, failed to approve the same.[1] (School Committee Exhibits No. 6A and 6B).
 21. Upon receipt of the Commissioner's response, the School Committee voted to restore $1.5 million to its budget and seek a special election referendum to ask the voters to restore said funds to the school budget.
 22. On August 28, the Town Council denied the School Committee's petition for a second referendum, essentially stating that the voters had conclusively voiced their opinions on the subject.
 23. As a result of negotiations initiated by Superintendent Spear, the School Department was able to obtain an agreement with the Coventry Teachers' Alliance whereby the union agreed to "give back" contracted-for raises in wages and benefits for the 1995-1996 school year in return for an extension of their collective bargaining agreement. This September 8, 1995 agreement between the teachers' union and the School Committee allowed an additional $500,000 to be trimmed from the Committee's budget.
 24. Through correspondence and meetings, the School Committee and the Town Council continued to negotiate towards a resolution of the budget dispute.
 25. On November 15, 1995, a second voter referendum was held in the Town of Coventry in order to seek voter approval to supplement the 1995-1996 school budget by an additional $1 million. Said referendum was defeated.
 26. On November 16, 1995 the Coventry School Committee resolved to seek legal recourse pursuant to R.I.G.L. § 16-2-21.4 in order to seek sufficient appropriation of funds to meet its statutory obligation to provide all Coventry schoolchildren with a quality education and to fund in full all contractual obligations to the vendors and employees of the Coventry Public Schools.
 27. Public Law 95-173, the so-called Caruolo Bill, was enacted on July 3, 1995 and codified at R.I. Gen. Laws § 16-2-21.4. The instant case is the first school budget reconciliation to be decided on the substantive merits by a Superior Court under the new legislation.
 28. Evidentiary hearings were conducted in the instant case on December 12, 13, 14, and 18, 1995.
 29. Superintendent Spear had developed a series of proposed budget reductions to be implemented if additional appropriations were not made. (School Committee Exhibit No. 10). These reductions aggregate $1,000,000 (one million dollars). The Superintendent unequivocally testified that each of the separate reductions would directly and negatively impact on the School Committee's ability to provide a quality education to the students and further would, in his opinion, violate the requirements of the BEP, (School Committee Exhibit No. 4), and/or would prevent the School Committee from complying with its obligations under existing contracts.[2]
 30. Due to the fact that the School Committee determined that the proposed reductions set forth in said Exhibit No. 10 were "necessary expenditures over authorized budget," it authorized expenditures and/or encumbrances up to such amounts as were required to fund what it said are mandated programs and services.
 31. Of the $1,000,000 reflected in said Exhibit No. 10, approximately $515,000 had been expended as of November 30, 1995, and it was anticipated that by the date of this decision an additional $115,000 would have been so expended.
 32. The School Committee's position, as evidenced by Superintendent Spear's testimony, is that every dollar appropriated to it by the appropriating authority plus $1,000,000 as reflected on its Exhibit No. 10 is required in order for it to fulfill its obligation to meet the provisions of federally and state mandated programs (including the BEP) and to pay for its legally incurred contractual and other obligations. Except as herein otherwise set forth, the Court so finds as a matter of fact.
 33. The appropriated funding for the School Department has increased in each of the last 3 school years (fiscal period July 1 — June 30):

 1993-94 $31,687,117
 1994-95 $33,587,377
 1995-96 $34,287,572

 Well more than 50% of these appropriations come directly from municipal tax revenues. (School Committee Exhibit No. 11).
 34. Subsequent to the original preparation of the School Department's budget there were a number of retirements or resignations of teaching personnel (total number 15). Most, if not all, of these personnel were replaced by lower paid personnel for a net savings as against budgeted for expense of $110,840.
 35. As a result of retirements and resignations of senior administrative personnel (Assistant Superintendent and Director of Business and Finance) the School Committee, by not hiring replacements through the end of this school fiscal year, would effect a net savings as against budgeted for expense of $22,000.
 36. The School Committee budget allocated money to employ a technology coordinator, a newly established position. As of the time of the hearings in this matter that position had not been filled. If the position is not filled the School Committee would effect a net savings as against budgeted for expense of $50,000.
 37. In many of its provisions the BEP is general in nature. For example BEP Topic 29 deals with Student Activities Program (School Committee Exhibit No. 4 at pages 222 and 223). The School Committee budget allocated $247,000 for extra-curricular activities. Of that amount approximately $85,000 had been expended as of November 30, 1995, and it was anticipated that by the date of this decision an additional $30,000 would have been so expended. If no further expenditures were made for 1995-96 extra-curricular activities (BEP Topic 29 Student Activities Program), the School Committee would effect a net savings as against total requests herein of $132,000. The Town suggests in its Post Trial Memorandum that "elimination of extra-curricular activities for the spring quarter would result in a savings of approximately $103,000." For the purposes of this decision the Court will utilize the last mentioned figure.
 38. The School Committee budget allocated money to pay an answering service. The purpose of such service is to enable personnel who, because of illness, will be unable to report to work to notify the service which then attempts to arrange for a substitute teacher or clerk as the case may be. The task handled by the answering service could be handled by School Committee employees. The amount budgeted is $7,200. The Court finds that a $3,000 savings could be realized by terminating the outside answering service.
 39. The School Committee's budget also contains expenditures for items such as substitute clerks, mail delivery and training for the technology coordinator referred to in finding 36 above from which the Court finds that an additional $30,000 could be cut without adversely impacting compliance with the BEP or other required programs.
 40. The Court finds that saving the amounts reflected in findings 34 through 38 as therein stated will not negatively impact on the ability of the School Committee to comply with the provisions of the BEP, or of any federal of state mandated program called to its attention by the parties.
This Court would be remiss if it did not note the commendable zeal of Superintendent Spear with respect to obtaining funding for the Coventry School Department. The Superintendent testified for the better part of 3 days, demonstrating a thorough knowledge of the budgetary process, of the line items contained in his budget, and of state law with respect to education. The Superintendent also demonstrated an ardor for the Coventry school system unmatched, in this Court's experience, by feelings towards any institution. This Court would also note its personal predilection for devoting whatever is necessary by way of funding to insure the best possible education for public school students.[3] However, this very litigation draws into sharp focus the perhaps, inevitable conflict between competing forces; that is to say, the School Committee and education on the one hand and the Town and its taxpayers on the other.[4] This conflict has been referred to as an ". . . . existing tension in Rhode Island education law with respect to School spending." SeeWesterly School Committee v. Town of Westerly, R.I. Commissioner of Education, August 18, 1993, p. 6.
APPLICABLE LAW
In order for this Court to reach a decision predicated upon the facts found by it it is necessary to undertake a review of applicable law. That review starts with the provisions of the Rhode Island Constitution, Article XII, sec. 1, wherein it is stated:
 "The defusion of knowledge, as well as of the vitue among the people, being essential to the preservation of their rights and liberties, it shall be the duty of the General Assembly to promote public schools, and to adopt all means which they may deem necessary and proper to secure to the people the advantages and opportunities of education."
Our Supreme Court in the recent case of City of Pawtucket v.Sundlun, 662 A.2d 40, 57 (R.I. 1995), indicated that under the provision of the Constitution referred to above education is the sole responsibility of the General Assembly which enjoys ". . . plenary powers in educational matters."
The General Assembly in the exercise of that power has enacted substantial legislation dealing with educational matters and dealing with the funding of education. Included are the following sections of our General Laws:
 "Section 16-2-9. General powers and duties of school committees.
 "(a) The entire care, control and management of all public school interests of the several cities and towns shall be vested in the school committees of the several cities and towns. School committees shall have, in addition to those enumerated elsewhere in this title the following powers and duties:
 "(9) To adopt a school budget to submit to the local appropriating authority.
 "(10) To adopt any changes in the school budget during the course of the school year.
 "(11) To approve expenditures in the absence of a budget, consistent with state law.
 "(c) . . . . The school committee of each school district shall be responsible for maintaining a school budget which does not result in a debt."
 "Section 16-2-21(3). Only a school budget in which total expenses are less than or equal to their appropriations and revenues shall be considered an adopted school budget."
 "Section 16-7-23. Community requirements — Adequate minimum budget provision.
 "The school committee's budget provisions of each community for current expenditures in each budget year shall provide for an amount from all sources sufficient to support the basic program and all other approved programs shared by the state. For fiscal year 1995, each community shall contribute funds to its school committee an amount not less than its fiscal year 1994 contribution for schools. The courts of this state shall enforce this section by writ of mandamus."
 "Section 16-7-24. Minimum appropriation by a community for approved school expenses.
 "Each community shall appropriate or otherwise make available to the school committee for approved school expenditures during each school year, to be expended under the direction and supervision of the school committee of that community, an amount, which, together with state education aid and federal aid: (i) shall be not less than the costs in the reference year of all optional programs shared by the state; provided, however, that the state funds provided in accordance with § 16-5-31
shall not be used to supplant local funds. The board of regents for elementary/secondary education shall adopt regulations for determining the basic education program and the maintenance of local appropriations to support the basic education program."
It is clear to this Court that while the plenary power rests with the General Assembly, that body has, through a diverse statutory scheme, delegated various portions of that power to various bodies. For example, the School Committee has the duty to undertake "the entire care, control, and management of all public school interests. . . ." and, the power "to adopt a school budget and to maintain a school budget which does not result in debt". The Town under the statutory scheme is required to provide funds so as to operate the schools, and the Board of Regent for Elementary/Secondary Education in this context has the power to adopt regulations with respect to the BEP and to the maintenance of local appropriations to support the BEP (Section 16-7-24).
Predicated on the foregoing, this Court finds that our law requires that the Town appropriate to the School Committee an amount which together with state and federal aid (and other revenues) is not less than the costs of the basic program together with the costs of other state or federally mandated programs and also the costs of collective bargaining and other lawfully incurred obligations. See Exeter-West Greenwich RegionalSchool District v. Exeter-West Greenwich Teachers' Association,489 A.2d 1010 (1985).
LAW APPLIED TO THE FACTS AS FOUND
This Court is very mindful of the testimony of an expert witness produced by the Town, Henry Tarlian, a former superintendent of schools in the city of Warwick. Mr. Tarlian suggested in his testimony that the School Committee's proposed expenditures could be categorized in one of three ways. Expenditures were: (a) "must haves", (b) "should haves" or (c) "nice to haves." In the context of a dispute between the appropriating authority and the School Committee this Court rejects Mr. Tarlian's trilogy and suggests, in his terms, expenditures must be categorized as either "must haves" or everything else, "nice to haves." The must haves are the sums necessary to comply with the BEP and state and/or federally mandated programs together with the costs of collective bargaining contracts and other lawfully incurred obligations.
This Court believes that an appropriating authority has no legal obligation under the present state of our law to fund anything other than sums necessary to comply with the BEP and state and/or federally mandated programs together with the costs of collective bargaining contracts and other lawfully incurred obligations.
An argument has been made that our law requires that the appropriating authority (here the Town) must provide and fund a quality education. This Court has sought a definition of that term or in the alternative precedential guidance as to what quality is required. Finding none this Court holds that (for the purposes of this litigation) quality education must be that education which complies with the BEP and mandated federal and state programs.
Of course, an appropriating authority may provide and fund a more enriching or wider program, but to the extent that it choses so to do that is a political rather than a legal decision.
Based upon the facts as found (specific reference being made to findings in 32 and 34 through 39) this court finds that the amount appropriated to the School Committee is $681,160 less than is needed in order for the School Committee to adequately run the Coventry schools for the 1995-96 fiscal year with a balanced budget as mandated by State law.
Counsel for the School Committee is directed to prepare and present an appropriate order and judgment directing the Town to provide an additional $681,160 to the School Committee. Nothing herein contained shall be construed as an order or direction to the School Committee with respect to the expenditure of such additional funding.[5]
[1] See, discussion of this exchange of letters at page 5 supra.
[2] This is, of course, the dispositive issue to be decided by this proceeding. See discussion of relevant law Infra.
[3] This court's personal opinion is, of course, of no consequence in this matter.
[4] Twice at townwide referendum the taxpayers have, in effect, said "No" to the School Committee with respect to this year's budget requests.
[5] See Finding of Fact 6 at page 8 supra and case therein cited.